

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-1047

| | |
|---|---|
| | Opinion Delivered April 19, 2017 |
| GEORGE PALMER | APPEAL FROM THE ARKANSAS |
| APPELLANT | WORKERS' COMPENSATION |
| | COMMISSION |
| V. | [NO. G503911] |
| MIDWEST FERTILIZER, INC., AND | |
| NATIONWIDE AGRIBUSINESS | |
| INSURANCE CO. | AFFIRMED |
| APPELLEES | |

## BRANDON J. HARRISON, Judge

George Palmer appeals the decision of the Arkansas Workers' Compensation Commission (the Commission) that reversed the administrative law judge (ALJ) and found that he did not prove that he had sustained a compensable injury. He argues that the Commission's decision is not supported by substantial evidence. We affirm.

Palmer, an employee of Midwest Fertilizer, Inc., claimed that he sustained a compensable injury when he stepped into a pool of water tainted with chemicals and aggravated a blister on his right foot. This aggravation led to a severe infection that resulted in the amputation of Palmer's right leg below the knee. Palmer sought compensation for his medical treatment and temporary total-disability (TTD) benefits; Midwest controverted the claim in its entirety. An ALJ conducted a hearing on the matter in February 2016.

SLIP OPINION

Palmer's testimony was as follows: He began working for Midwest as a location manager on 20 April 2015, and on approximately May 12, he arrived at work between 7:00 a.m. and 7:30 a.m. and discovered a pool of standing water near a loading area. It had rained the night before, and when it rained, the rainwater ran through the area where the fertilizer was mixed and pooled in a bay area of the loading facility. When this occurred, it was customary to drain the area, so Palmer used a sump pump to drain the water out. While doing so, Palmer briefly stepped into the water to get a kink out of the drainage hose. He was wearing New Balance tennis shoes that were not water resistant, and he continued working throughout the day without changing or drying off his socks or shoes. He also had a blister on the big toe of his right foot from wearing cowboy boots a week or so previously that he had been treating with Neosporin.

Palmer did not notice any discomfort that day, but that evening he noticed raw areas across the top of four of his toes (but not his big toe), which he treated with Neosporin. He returned to work but noticed, approximately ten days later, swelling in his right ankle and a clear discharge from around the blister area. He treated his foot by elevating it, but it continued to worsen, and he developed a limp. He also tried applying ice to his foot and soaking it in Epsom salts. On May 20, he began experiencing chills, nausea, and vomiting. On May 21, Palmer told his supervisor, Chris Newhart, that "there was something in the water that I stepped in that must be causing the swelling" and that he needed to see a doctor. Palmer left work early and went to a clinic, but he did not see a doctor because he could not afford the $100 payment. On Sunday, May 24, Palmer noticed a black spot on the top of his right foot, and when a second black spot appeared on May 25, Palmer went to the

emergency room at Northwest Medical Center. He was admitted to the hospital that same day.

Dr. Marc Rogers examined Palmer and began treatment with antibiotics. Rogers eventually amputated the big toe on Palmer's right foot and later his right leg below the knee. Palmer continued follow-up care with Rogers and attended physical therapy both before and after receiving a prosthetic. He returned to work at Midwest on September 17. Palmer obtained health insurance with Blue Cross Blue Shield in July 2015 and was eligible for health insurance through Midwest in October 2015, but he had no health insurance coverage for the treatment he received prior to 1 July 2015. His current bills totaled over $200,000.

According to Palmer, any issue with his blood sugar was first mentioned to him in 1998 when he underwent a stent procedure. He was prescribed Metformin, which he took for a short time but discontinued taking it when he left his employment and could no longer afford it. In 2014, he was told by another doctor that his blood sugar "was borderline on being a diabetic" and again prescribed Metformin, but he again discontinued taking the medication because it was too expensive. He denied that he had ever been diagnosed with or treated for a diabetic ulcer anywhere on his body. He also denied being aware that he was diabetic before he was admitted to the hospital on May 25.

Chris Newhart, a general manager at Midwest and Palmer's supervisor, testified that he first noticed a problem with Palmer's right leg around May 20. Newhart noticed Palmer limping and asked him what had happened; Palmer said that he had "twisted his ankle or something getting off the skid steer." Newhart told him the next day to go see a doctor if

he wanted to. According to Newhart, "[Palmer] may have said something about stepping into the water previous to that, but I really—all I took was that he had twisted his ankle getting off the skid steer."

Dr. Marc Rogers's deposition was introduced as a joint exhibit. In that deposition, Rogers explained that he physically examined Palmer on May 27 and noted swelling and an eleven-millimeter ulcer on the bottom of his right big toe: "foul-smelling drainage, pus, and it was black on the top of the toe, and it appeared to me that it was full thickness, dried gangrene on the top." Rogers performed a debridement to remove the contaminated and necrotic tissue and found "extensive soft-tissue infection and necrosis of the toe, as well as infection of the bone of the great toe, of the first toe, and a large amount of tissue necrosis." Rogers performed a second surgery, a below-knee amputation of the foot, on June 2. Rogers agreed that Palmer had "some problem with blood sugars" upon his admission, but Rogers did not know if Palmer had a preexisting history of diabetes. Palmer complained to Rogers that "the diagnosis of diabetes was all over the record" and that "workers' comp was going to use that as a basis to deny payment." At Palmer's request, Rogers wrote a letter outlining the course of events as Palmer had described them. In the letter, Rogers concluded that "it is my opinion that with good medical certainty, the inoculation to his foot occurred when he stepped into the water while at work on May 12, 2015." In his deposition, Rogers clarified that this opinion was based "strictly [on] the sequence of events that occurred." He agreed that he would not have had to perform the right-leg amputation if Palmer had not stepped in that pool of water.

In March 2016, the ALJ issued an opinion and found that Palmer had proved that he suffered a compensable injury. The ALJ awarded payment for all reasonable and necessary medical treatment related to the compensable injury and TTD benefits from 25 May 2015 to 17 September 2015. In its findings, the ALJ found that Palmer did have a preexisting diabetic condition but noted that "an employer takes an employee as it finds him and employment circumstances that aggravate pre-existing conditions are compensable." The ALJ concluded that "the incident of claimant getting his foot wet aggravated his pre-existing diabetic condition which eventually led to the infection and amputation of claimant's right leg below the knee." The ALJ also specifically found Palmer credible:

> Given claimant's testimony which I find to be credible based upon my observations at the hearing, the history of injury given at the emergency room, and Newhart's testimony that claimant might have said something about stepping into water to him, I find claimant's testimony to be credible regarding the time line of events in this case. Furthermore, I find that Dr. Rogers'[s] opinion that the inoculating factor in this case was claimant stepping into the water at work to be credible.

Midwest appealed to the Commission, and in an October 2016 2–1 opinion, the Commission reversed the ALJ. The Commission found that neither Newhart's testimony nor the medical evidence corroborated Palmer's testimony. It noted that Dr. Cobra Shanley, who initially attended to Palmer upon his admission to the hospital, assessed "diabetic foot ulcer and cellulitis, highly likely he has an evolving sepsis." The Commission found that "the evidence does not demonstrate that these diagnoses resulted from the claimant's foot becoming wet on or about May 11, 2015" and that the record did not show that the assessment of sepsis "was causally related to an incident at work." The Commission also found that "[t]he record does not show that the soft-tissue infection or poorly-

controlled diabetes were caused by stepping into the pool of water at work, or that these conditions were aggravated by the alleged incident." The Commission acknowledged Dr. Rogers's opinion regarding causation but rejected it, noting that his opinion "was based on the history provided to him by the claimant." The Commission concluded:

> The evidence before the Commission does not corroborate the claimant's testimony. The Full Commission finds in the present matter that the claimant was not a credible witness, and that the claimant did not prove his pre-existing diabetes or necrotic infection were the result of stepping into a pool of water at work.
>
> Additionally, even if the claimant had stepped into a pool of water which was laden with chemical contaminants, Dr. Rogers was not sure whether this alleged incident really caused the infection in the claimant's right foot. . . . There is no probative evidence before the Commission demonstrating that the claimant's hospitalization and treatment beginning May 25, 2015 were causally related to a workplace incident, or that such an incident "aggravated" a pre-existing condition leading to the claimant's need for treatment.

Palmer has appealed the Commission's decision.

We review the Commission's decision in the light most favorable to its findings and affirm when the decision is supported by substantial evidence. *Parker v. Atl. Research Corp.*, 87 Ark. App. 145, 189 S.W.3d 449 (2004). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* It is the Commission's duty to make determinations of credibility, to weigh the evidence, and to resolve conflicts in medical testimony and evidence. *Martin Charcoal, Inc. v. Britt*, 102 Ark. App. 252, 284 S.W.3d 91 (2008). The issue is not whether the appellate court might have reached a different result from the Commission but whether reasonable minds could reach the result found by the Commission: if so, the appellate court must affirm. *Parker v. Comcast Cable Corp.*, 100 Ark. App. 400, 269 S.W.3d 391 (2007).

Palmer asserts that the Commission committed three errors in its opinion: (1) it characterized his preexisting diabetes as the cause of his infection and failed to address the preexisting ulcer and the aggravation of that ulcer that occurred when he stepped in the water; (2) it found Palmer was not a credible witness without citing any evidence in support of that finding; (3) it discredited Dr. Rogers's opinion without addressing all the evidence that supported that opinion.

## I. *Aggravation of Preexisting Condition*

On the first error, Palmer contends that there is no dispute that he had preexisting diabetes and a preexisting wound on his right big toe at the time he stepped in the water. He argues that even if the wound is characterized as a diabetic ulcer, that fact would not change the essence of his claim, namely that the wound was aggravated by stepping in the water, because there was no proof that the wound was infected prior to stepping in the water. In other words, "[t]he issue in this case is clearly the source of the infection that Appellant developed in his pre-existing wound," and the "evidence presented in this case is clear that there were no signs of infection until after Appellant stepped in the pool of water." Palmer notes that there was no prior medical treatment for any infection and that Dr. Rogers opined that the infection and resulting amputation were caused by Palmer stepping in the water. He claims that the Commission failed to adequately address the aggravation issue or the evidence supporting it.

In response, Midwest argues that Palmer has disregarded the standard of review, which requires us to review the Commission's decision in the light most favorable to its findings. Midwest asserts that contrary to Palmer's assertion, the aggravation claim was

analyzed and rejected based on the Commission's "very plausible interpretation of the facts in holding claimant had not proven causation." The Commission clearly addressed the issue, because it held that there was no probative evidence that Palmer's hospitalization and treatment were causally related to a workplace incident "or that such an incident 'aggravated' a pre-existing condition." And in resolving the uncertainty of how and when Palmer's foot became infected, substantial evidence supports the Commission's conclusion that causation was not proven. Midwest notes that Palmer did not know when the infection began, that at least ten days passed between the alleged incident and the onset of symptoms on Palmer's right big toe, and that Dr. Rogers opined that an infection could have occurred without Palmer stepping into water.

We find no basis for reversal on this point. Our standard of review requires us to affirm if reasonable minds could reach the result found by the Commission, and in this case, we hold that reasonable minds could so reach. We therefore affirm.

## II. *Palmer's Credibility*

On this point, Palmer argues that the Commission found him not credible without citing to any support in the record for this finding. He acknowledges that credibility findings are within the exclusive province of the Commission but argues that because this finding on the issue of credibility "is based upon no evidence at all," it conflicts with the basic standard that the Commission's decision must be supported by substantial evidence. Rather, such a finding has "resorted to speculation and conjecture."

In response, Midwest asserts that the record substantiates the Commission's finding that Palmer was not a credible witness. For example, Midwest notes that Newhart's

testimony and certain medical evidence did not corroborate Palmer's testimony. It also points out that Palmer denied he was ever officially diagnosed with diabetes, which is contradicted by the proof; thus "reasonable minds could easily find his credibility is suspect based on his blatant denial of a diabetes diagnosis."

We must affirm on this point. This court is foreclosed from determining the credibility and weight to be accorded to a witness's testimony. *Texarkana Sch. Dist. v. Conner*, 373 Ark. 372, 284 S.W.3d 57 (2008). The Commission is the ultimate arbiter of weight and credibility; it has the authority to accept or reject medical opinions, and its resolution of conflicting medical evidence has the force and effect of a jury verdict. *Bridgestone/Firestone, Inc. v. Hensley*, 2010 Ark. App. 375.

### III.  *Dr. Rogers's Opinion*

Palmer acknowledges that the Commission gave little probative value to Dr. Rogers's medical opinion because it was based on the history provided to him by Palmer. But Palmer argues that the Commission erred because it did not acknowledge or discuss the other elements upon which Dr. Rogers based his opinion, namely, "his knowledge, experience, actual care and treatment of the claim and what he saw when he was treating [Palmer]." Thus, Palmer contends, the Commission's determination of the probative value of Dr. Rogers's opinion was not supported by substantial evidence. In response, Midwest asserts that Dr. Rogers's opinion was "built on [a] faulty foundation," namely, Palmer's "non-reliable history." Midwest also notes that under our standard of review, the question of reliance on medical opinions is within the sole province of the Commission.

Midwest correctly notes the standard of review. The authority of the Commission to resolve conflicting evidence also extends to medical testimony. *Swift-Eckrich, Inc. v. Brock*, 63 Ark. App. 118, 975 S.W.2d 857 (1998). The Commission is entitled to review the basis for a doctor's opinion in deciding the weight and credibility of the opinion and medical evidence. *Id*. Therefore, we must affirm.

Affirmed.

VIRDEN and GLOVER, JJ., agree.

*Bryant E. Crooks*, for appellant.

*Womack Phelps Puyear Mayfield & McNeil, P.A.*, by: *Mark Mayfield* and *Chuck Gschwend*, for appellee.